Hear ye, hear ye, hear ye, this Honorable Appellate Court of the 2nd Judicial District is now back in session to adjourn. Now, Susan F. Hutchinson is the presiding judge. Please be seated. Now, Your Honor, this case on document 2-15-0002. Zoey Stadbrock, et al, plaintiff's appellate, the Edward Health Services, and Thomas Chang, M.D., et al, defendant's appellate. Arguing on behalf of plaintiff's appellate, attorney Pete A. Bison. Arguing on behalf of defendant's appellate, attorney Mr. Hugh C. Griffin. Also arguing on behalf of defendant's appellate, attorney Mr. Robert L. Larson. All right. Sorry for the delay, counsel. We have several arguments set today, and we're trying to keep them in order if possible. Could you give me your name again, sir? It's Pete A. Bison, Your Honor. Pete A. Bison? A. Bison. A. Bison. Okay. Please step forward. May it please the Court, and good morning. I represent the Stadbrooks, and, Your Honors, this was a close case. The trial judge said that in the hearing of the post-trial motion, and that's the setup for our argument here. In a close case, and a jury might have decided either way, any substantial error which might tip the scales in favor of the successful party calls for reversal. That's clear case law in the Illinois Supreme Court of Longstanding. And the doctrine presumes prejudice. In a close case, any substantial error could have tipped the balance and therefore requires reversal because there's no way to measure its effect. Can you identify the issues that are considered close? I mean, which part of- Yes. Yeah, well, I think everything was close. It was a battle of the experts and the issues of negligence and proximate cause from the get-go. There was a completely conflicting testimony on whether the defendants deviated from the standard of care. There was completely conflicting testimony on the issue of proximate cause, and those are the two core issues in any medical malpractice trial. And as I mentioned, Judge Polkjoy, in the post-trial motion, observed, and I think correctly, and the record supports this, this was a close case. This case could have gone either way, heading into closing arguments, but for the error that we're here addressing with your honors. Specifically- Well, whether or not the case is considered close, how did the admission of this video animation materially affect the outcome when it was agreed that the proximate cause was the occurrence or the complete occlusion of the umbilical cord at 12.08? And that there were, the fetal monitor strips did show decelerations at variable times. So there was agreement on those two matters, was there not? Well- Was that correct? There was a partial agreement where there was a difference, and it was a big difference, was on the issue of the negligence and the proximate cause. The plaintiff's theory of the case was that there were problems with the monitor strips being shown two to three hours before that last event that was shown on, depicted on the video, that would have required delivery, and if those events involved the beginning of this hematoma and leakage of the blood that was contributing to cause that, and on a proximate cause basis, if the delivery had been done before that last event, there also would have been no injury. So, but that was a heated debate, that's a close case issue. But there was no way to know what was causing those decelerations, correct? While those monitor strips were being viewed, and wasn't the testimony, didn't the experts agree that whatever the cause, if they were concerning and if they were non-reassuring, then action should have been taken earlier? Well, that was our expert's testimony, yes. Right, I said if they were. And as you pointed out, nobody knew at the time. We know retrospectively, at least the plaintiff's theory was, the hematoma had already started, but regardless of whether they knew that at the time, our evidence was that the standard of care required the earlier delivery, which would have provided this outcome. Even though the earlier strips did show this deceleration, but then seemed to correct themselves? Well, they would correct and uncorrect. There were various things going on. There was times when it was worse than other times, is the way I would say is a fair way to look at that. Go ahead. Well, just to follow up then, is that what your expert was relying on, that on those times when it was worse, that was an indication that something was not right within this birth process? Correct. Starting around 9 p.m. is when Dr. Blake testified that at that point they should have called for a C-section because it was no longer safe to keep this baby in there because something was going on, whether you knew what it was or not, that could get worse and that baby needed to be delivered. That was an ongoing thing. And then there was a second point just before midnight when the C-section should have been called on an urgent basis before this last event, that in that short window of time, that still could have prevented the outcome. So this was an ongoing process that continued past 9 o'clock at any time at that point up until just before midnight. If the C-section had been done, as our expert said it should have been done, it would have prevented this tragic outcome. So let's focus on these animations. Were they not generally explanatory of the medical issues, the formation of the hematoma, the complete occlusion, and the decelerations? Isn't that, and again, focusing on the two that are the main focus of the briefs? With all due respect, Your Honor, I think they were an argumentative presentation of one theory of the case that had some pieces of things that were generally explanatory. Well, how were they? But they weren't the entire animation. If I can just answer your question. The entire animation itself was not explanatory. It was embedded with and tainted with argumentative, theoretical stuff that was slanted completely to one theory of the case. Okay, so what's the argumentative, theoretical stuff that you find objectionable and that you felt predisposed the jury? Let me start with the fact that it took 11 seconds from the start of that hematoma until it completely filled up. Despite whatever anybody says after the jury saw that, the jury saw that over and over and over again to emphasize the point that this was a sudden catastrophic event that had not been going on for two or three hours, as our evidence showed. That's number one. Number two is it didn't account for the fact that even the defense pathology expert agreed that some of that blood had leaked out as long as two or three hours before, and this was not a sudden event that happened that fast. It did take time. Their own expert didn't support what was shown on that video. Why was timing an issue? Pardon? If there were admonitions given to the jury. Well, the timing was an issue because all the jury saw in this video was something that there was no evidence to support, that this happened in 11 seconds, and the timing was a major issue in the case because our theory of the case was that the delivery should have taken place hours before that became 9 centimeters. Timing was the whole issue in the case. But nobody knew what the reason word was for any of these decelerations. Isn't that correct? But our evidence was you didn't need to know. You just need to know that was a bad situation and that child needed to be delivered. You find out later what the reason is. The first priority is getting the baby out before things get worse. That was our theory of the case. That's what our experts testified to. But both experts agreed on proximate cause, did they not? The only thing they agreed on is that the brain injury had not happened until that last event. But our experts also said that if the baby had been delivered when the baby should have been, then that event would have never happened. And that is proximate cause. But they agreed on the terminal bradycardia being the cause of the oxygen flow stop, correct? Correct. And then damaging the child's brain. Correct. But our experts also said that if the standard of care had been complied with and the delivery had been taking place when they said it should have been taking place, you would have never gotten to that catastrophic event. The child would have been fine and we wouldn't be here. That was the plaintiff's case. So you're saying the problem was the timing portrayed on the animation in A3? That's number one. Okay. And there's more than one part of that. There's the how fast they show it happening and combined with the fact that it was uncontested, even by their own experts, that this didn't happen in seconds or minutes. It was at least 30 minutes up to two hours from when this had started to the time of when it completed. So if this had been a 30-minute video, if they had stretched it out for 30 minutes, would you have still had the same objection? Well, it's interesting because one of the things they pointed out in their briefs is, you know, the plaintiff is arguing that they should have been able to do a three-hour video or something. Well, if we did try to do that, could you imagine what the other side would be saying is that that would be inflammatory and improper? They have a jury sit there for three hours watching all these opportunities to get this baby out before the last catastrophe occurred. That would be equally improper because it is advocating. It's a demonstrative being used as an advocacy tool, an argumentative tool, and indoctrinating the jury to one theory of the case. Don't all demonstrative exhibits have an element of that? I mean, why else are you going to use a demonstrative exhibit other than to get your point across? I mean, that's all it is. Getting your point across is different. I actually, with all due respect, disagree with that, Your Honor. One of the requirements of a demonstrative is that it educates the jury about something that helps them understand the case. But it is improper for it to indoctrinate the jury or push one theory of the case when there are two different theories. The case law is very consistent on that. And there's education, there's education. I mean, if you have a – and some of the case law makes – I mean, it's interesting. If you look at the case law, it talks about a still document, like a drawing or something like that. That is handled in a different way, and it is less likely to cause the problems we're talking about here. But the problem in this case with this video is that timing was a key issue in the case of when this occurred, how fast it occurred. And the jury got one video from them that showed something in 11 seconds, which none of the evidence showed was true. That wasn't even supported by the evidence. And to lay on top of that some partial – say, well, don't pay attention to what you're seeing. We're not saying that's how fast it happened, and see that over and over and over again. You cannot undo that from the consciousness of jurors who are sitting there watching the trial. Counsel, isn't really, though, the focus here not necessarily how long it took the hematoma to develop, but really whether or not the defendants, the nurses, and Dr. Chen properly evaluated these fetal monitor strips? They were both issues, Your Honor, with due respect. They were both – that's the thing with these cases. These are complicated cases. There's multiple issues. There was an issue about whether they did the right thing with the strips. But that juxtaposes with the issue of what was going on, either prospectively or retrospectively, and it juxtaposes with what ends up happening later and what would have happened if they had delivered the child. These things are – they're completely tied together in these cases. So the issue wasn't only whether they monitored the baby or took the right action. The issue was always also whether if they didn't and they should have delivered the child sooner, on proximate causes, is this injury caused because they failed to deliver the child sooner? And the evidence on that is uncontested. But was there any evidence in this record that indicated it would be dangerous in any way to deliver that child earlier? No. I don't believe there's anything in the record that anybody said. In fact, Dr. Chen, I believe, could acknowledge that he could have delivered the baby earlier. Nobody ever said it was dangerous. First of all, this was a full-term baby. It was not premature, and there was no reason to keep the baby in to help the baby be more healthy. And if the baby's at risk and there was no contraindication to the mom having a C-section, and that was never discussed with her, but the answer to your question is there was no evidence in the case that it was dangerous that they did a C-section. How many times during the actual examination of the expert that looked at these animations and then in argument, was the jury reminded that we're showing you this not for time but for what happened? You know, I actually don't. Most of the time, maybe I'll just concede that. I don't remember for sure if it was every time, but I'm certainly not saying they didn't do it on a number of cases. But the problem, if I could just – Was it like three or four, I believe? I don't even remember how many times they showed it, to be honest with you. Well, that was going to be my next question. You can't say it over and over again. Well, the jury saw this, I would say, at least 20 times during the trial. I mean, that's just – I mean, I was there. I mean, I remember that well enough. It was shown multiple times during several different witnesses' testimony, and it was shown in the closing arguments. But it was not shown during the plaintiff's case in any way during cross-examination of your witnesses. Correct. It was not pursuant to an order that the trial court entered. Isn't that correct? That's true. And that has to do with the timing issue. Well, it had to do with the – well, it had to do – yeah, I think that was essentially what the judge's reasoning was, sure. But can I just say one thing about this video that I just – if I have just a minute or two, I know you have a lot of questions for me. But I really feel bound to put something together on this video that may not jump out from the briefs. I'm talking about the umbilical cord hematoma. If you look at that very carefully and you follow it from the beginning to the end, what you see is a generic representation, which is fine at the beginning of how the blood circulates in the baby. We didn't have a problem with that part of the video. Then we get to the part we've talked about already where you show the 11-second rupture, complete fill-up of the hematoma, and we've talked about what the problems are with that. But the rest of this video was also problematic. It shifts from this generic person, this generic baby, to Zoe's pathology report and describing her hematoma. It then shows a picture of her hematoma that was taken by the pathologist. And if you look very carefully – and I encourage you to look at the video again if you didn't pick up on this, seen it before – at the very end, look at the configuration of the picture, the shape of the hematoma on that picture that she has, and then look what they did on the video. They superimpose the shape of that hematoma back into this generic animation to show the shape of her hematoma in this generic thing. So they weave her in through and through this video. And a visual image like that is compelling. You see it over and over again. The jury could easily be confused and misled and end up believing, even subconsciously, that this is what actually happened here with Zoe, despite all the protestations that they claim they made. Well, this isn't really how fast it took. And they were quibbling between seconds and minutes in terms of saying that. They never said – they never conceded that it was – that the lawyers didn't, when they made their statements, that this could have been two or three hours, as their experts did. Didn't – was the maximum the lawyers talked about was up to two minutes? Wasn't there some reference to two minutes as opposed to hours? Well, one of the disclaimers was – we're not arguing whether this is two to five seconds or two to five minutes or something like that, but it was always less than ten minutes, whatever was made with the disclaimer. But that completely didn't account for the other theory of the case. Did the judge ever give any sort of admonition on that? I think the only thing he did at the beginning, if I recall, and I guess from memory, and I would defer to the record on this because I didn't look for this, is I think the very first time he made a comment, this is demonstrative evidence, you know, a general cautionary thing, but I don't think he did anything further than that and then let the lawyers, the defendants, handle it after that. Was he ever requested to make any sort of admonition or no? I don't – you know, I don't recall. There was a picture of the hematoma that was introduced as evidence also. Oh, yeah, yeah. And that was blown up – that was blown up bigger than my arms are across. But in – the animation then really was cumulative. That evidence, since there were other photographs used, wasn't that evidence then cumulative of what else the jury saw? Well, I – with all due respect, I don't look at it that way, but my point about that photo is they plugged it into what was supposed to be something to help the jury understand generally what happens with this, and it became Zoe's video. And so the problem with that is what? The problem with that is it violates all the case law on the use of these animations. It is not a general explanatory thing. It became their theory of the case presented in a video and shown over and over and over again to this jury. And then the case law is clear on that. That's improper. That's the Spryka case. That was a timing case. That was a Paul Mariellism case about 1 o'clock was there. And one of the major problems with that as far as the appellate court was concerned is that there was a timing issue that was in dispute in the case, and the jury saw one video with one version of the timing. That was one of the problems, and that was the major problem. It wasn't the only problem, but that's exactly what the problem was here, is the jury was – it was an attempt to indoctrinate the jury and push one theory of the case when the facts are in big dispute in terms of when this happened and how it happened. And it wasn't a general explanation. It plugged Zoe into the video in two different ways, the picture of the hematoma, the description of the hematoma. And while you were not inclined to present a three-hour video, as you indicated, because you knew that that would raise all sorts of objections, what would have prevented you, other than timeliness of tender, from presenting a similar demonstrative-type evidence, taking the strip and showing specifically how that strip relates to acceleration and deceleration? Well, I could have done it, but our position is – I would have thought of it, but I wouldn't do something that I believe is improper. And if you want to talk about the other video, which showed this hypothetical baby with hypothetical, the court here, that nobody knew, hypothetically being compressed in a certain way, and then they put Zoe's strips on that, implying that that's Zoe and that's what's happening, that's just as improper. Why did it be no less improper than them doing it? The reason we didn't prepare anything and do anything like that is we – there weren't any objections to ours on that basis, and we did it in a different way that didn't cross that line. There was testimony, however, that she was born with the cord wrapped around her neck. Isn't that correct? Yeah, well, at the time of her delivery it was around her neck, but we don't know where it was two or three hours before, and we don't know exactly how it was, and we don't know where it was being compressed. And I'm not saying it was improper. If they had shown a generic video with a cord around the neck and had not put her monitor strips on it and said this is an example of how you can get variable decelerations, that's an explanatory video. That's the whole point about both of these, is explanatory is explanatory. Once you start laying in selectively certain facts of the case, and not all of them, and lay in disputed facts that are one side's theory of the case, that's what the case law says is improper and can't be done with this type of demonstrative. You will have an opportunity for response. Thank you, Your Honors. And then between Mr. Griffin, who's getting up, I guess it will be him first. Counsel, may it please the Court, Hugh Griffin for Edward Hospital and Nurses Oswald and Callahan. I kind of want to come back to the fundamental issue in the case, and that is whether Judge Popejoy, a better experienced trial judge, abused his broad discretion, defining our cases as making a decision no reasonable person could make, in his rulings on these two demonstrative exhibits. And we would respectfully submit he made a carefully crafted, even-handed ruling that does not conceivably violate his discretion. But what about- Counsel, with respect to A3, why wasn't this exhibit testimonial in nature, as opposed to informational, with the superimpositions of Zoe's pathology on her fetal monitor strips and the photograph of the hematoma? Well, to be perfectly frank, that argument- I think that's the first time I've heard that argument, but I'll be glad to deal with it. I mean, after all- Well, that's in their briefs, Counsel. They argued that this was adversarial, it was not informational. I mean, with all due respect- Let me deal with it. I mean, what the video showed was an 11-second demonstration of the undisputed physiological process by which a hematoma can form within a fetus's umbilical cord from a hole in the umbilical vein, and that that blood leaking out can then form a hematoma, accumulate within the cord to the point that it actually compresses the arterial vein and the arterial arteries that cuts off the fetus's blood supply. Every expert in this case agreed that's what happened in this case. We weren't allowed to use the exhibit during the testimony of their experts, but on page 33 of our brief I outlined all their testimony by their doctors. That's exactly what they described happened here. That's the process. Everybody agreed that's the process that brought about the tragedy. But the animation shows it happening in 11 seconds. And so the judge heard that argument and in his wisdom said, look, okay, I'm going to let you use this demonstrative exhibit, but every time you do, before you even get into it, you have to qualify it that this does not show the time. Because no one claimed it happened in 11 seconds. And defense counsel and their witnesses followed that admonition. If this jury knew anything by the end of this trial, it was that this demonstrative exhibit wasn't supposed to show the time it took for the hematoma to form from the first drop to the final 9-centimeter hematoma that cut off the oxygen. If there's anything that's clear, it's that. And so, again, I don't, you know, there's the case law talks about can you advocate your theory in the case? Are you allowed to do that? I believe under the cases we've cited, the Dillon case, Glassman case, the Bucknell case, yes, you're allowed to do that if there's evidence to support what you're demonstrating. I would say in this case, this demonstration was not one side's theory. It was both sides. It was the theory of both parties as to what happened in Zoe's case. So how does it reflect the fact that there was testimony also that the vein started leaking or could have started leaking much earlier, hours earlier, in fact? How is it representative of that? It wasn't. That was the whole point. It doesn't. It wasn't intended to show the time that the hematoma started or finished. That was told to the jury each time. So what was the intent then, counsel? Well, to show the jury what happened. Why were these other aspects superimposed? Everybody talked about this hematoma was the cause of the oxygen deprivation. Well, words can only describe so much. And so Judge Polk-Joy, in his wisdom, said, well, this will assist the jury in understanding what everybody's talking about when they say this hematoma blocked the flow of oxygen through the umbilical cord. But that's if looking just at that animation before everything is superimposed on it, they saw that. Then why did Zoe's monitor go up there? Why did the picture of the hematoma go up there on the same animation? And then why did it slide into the actual animation? Maybe subtle, but why did it slide into the animation? Why couldn't that be a separate slide if we're going to have a slide show, so to speak? Well, again, I don't remember that being the objection that was made in front of the judge. The only objection made to the judge was this is not the right time. But, again, there's no prejudice because everybody agreed that this was the general process that occurred. There was no dispute, and everybody agreed that the end result was the hematoma that's shown in the video and is described in the report of the pathologist. I mean, none of this is disputed. The timing issue, there was differing opinions on the timing issue, but as Your Honor, and Mr. Larson is going to deal with this, I think, some more, but as Your Honor already pointed out, the timing of the hematoma didn't play in at all to the standard of care issue. Why not, counsel? Because everybody agreed that no one, no obstetrician, is held to know that there's a hematoma. No obstetrician should suspect that there's a hematoma. No, it's not in your thinking. The case was judged, and this was the plaintiff's expert, too. He agreed nobody would know that. Nobody would be thinking that. We judge these scripts on the fetal rates that are shown over that five-hour period and whether with the baselines, with the decelerations, with the variables, we judge whether or not under the standard of care, a reasonable physician would have found those so unreassuring that he would have called an earlier C-section without regard to the hematoma because everybody agrees nobody would even suspect. So, again, that's the point, the second point, and we don't believe there was any error at all, but certainly it's not error that could affect the outcome of the trial, and we cited the two-issue rule as a general verdict case. The standard of care just didn't play into the hematoma timing. The fetal monitor scripts that appear overlaid onto the animation, I'm assuming those were also shown at other times during the trial. Is that correct? And I ask you the same question with regard to the pathology, which a part of the pathology report is overlaid on the animation. Am I correct in assuming that that portion of the pathology report was also viewed at some other time on the screen? No, throughout the trial it was referred to by many, many witnesses, and, of course, the picture of the hematoma in terms of cumulative was demonstrated throughout the trial as well. So everything that was overlaid onto that animation appeared at some other point during the trial? Is that right? Yes. Okay, thank you. And that's for sure. If I just could conclude my abuse of discretion point, again, Judge Polkjoy looked at this at the end of the trial. And he took his time and he went over it. He was there for the whole three weeks, and he listened again, and he reconfirmed that in his view there was no improper use. They were, in his words, appropriately utilized throughout the trial, and they did not deprive the plaintiff of a fair trial. And we would ask you to come to that same conclusion. Thank you. Thank you. Mr. Larson. May it please the Court. I'd like to address a couple of points that were raised in the discussions that we just had. First of all, with respect to the videos, I want to make a very important clarification. The fetal monitor strips were shown on the video that showed the cord compression. They were not shown on the video that showed the extravasation of blood in the hematoma. It was never our argument. But her pathology report was shown on that, was it not? It was shown on that. And the superimposition of the hematoma itself. Right. And that addressed the point that no one ever contested in this case, which is that it was this hematoma that caused the catastrophic injuries of the child. Nobody contested that point. We weren't really making an issue of timing. It was plaintiffs who really made the issue about timing here. If you look at the testimony of Dr. Blake, their primary liability expert, and you can read it in pages 7, 13, and 14 from the plaintiff's appellant's brief, he says, with respect to the hematoma, it is his position that went as far back as two to three hours. Let's give him the benefit of the doubt on that. The baby was delivered just before 1230 in the morning. That goes back at most to 930 in the morning. It was his opinion that Dr. Chen needed to perform the cesarean section at 9 o'clock in the morning, based upon changes that were occurring for reasons that had nothing to do with the hematoma. They were external compression forces related to the nuchal cord. So when we talk about timing and why the timing on the video had nothing to do with the standard of care, that's why. Because it's their own expert who says this needed to happen before the hematoma even began. So how do we now say, well, but if they thought the hematoma started later, then they'd ignore the fact that they should have taken the baby out earlier. Everybody agrees that if the baby had been taken out earlier, whether it should have been done or not, that this wouldn't have occurred. Of course it wouldn't have occurred. It's like if you don't get into a car, you're not going to have an accident an hour later. Yeah, but the baby doesn't have a choice. You get into the car, you get into the car. But the baby just wanted to get out. Is there anything in that record that would indicate that it should not have been done earlier? Or could not, the delivery could not or should not have been done earlier than 12-08? Oh, there's a lot of testimony that it did not, it wasn't required to be done earlier. But no, that's not the question I'm asking. Should not, I mean, I understand your argument that it wasn't necessary before that, but is there anything that would be indicative that it should not have been done at 9 or 9-30? No, and interestingly, Your Honor, that's actually another reason why this is not relevant. If we had argued that it could not have been done sooner, if we had argued that because this event occurred later, that even though we misread the strips three and a half hours earlier, jury don't worry about that because this happened later in the case, they might have an argument. Those arguments weren't made. We said, this case was all about the fetal monitor strips. The plaintiffs looked at the fetal monitor strips through their experts and said, you know what, you misinterpreted them at around 9 o'clock in the morning, you should have delivered the baby then. And had you done so, none of this would have happened. We said, you know what, we believe we read those absolutely properly and that there was no reason to deliver the baby before midnight. When we did so, we did so expeditiously. But this event, which we even conceded and agreed had probably been going on, the initial bleeding for some period of time, but it hadn't gotten to the point where it was compressing the artery and umbilical vein until after midnight when the catastrophic injury occurred. We didn't have time to get the baby out before that catastrophic injury occurred. But nobody, at no time in the trial, nor in plaintiff's argument in the brief, nor in ours, did we ever say, we could have been negligent earlier and it didn't matter because this event occurred later. That was never our argument in this case. If it had been, I could see the point they would be trying to make here. Well, how did the animations account for plaintiff's theory of the case then? Well, because the only theory of the case that we were trying to demonstrate with the two videos, the first video, frankly, the video regarding the compression of the cord by the baby, is perfectly consistent even with Dr. Blake's testimony. If you'll recall, Dr. Blake said 9 o'clock baby needs to come out for reasons that have nothing to do with the hematoma. Why? Because the cord was being compressed by the baby and causing changes that, in their view, should have necessitated a C-section before there was any bleed. As for the hematoma, we weren't arguing about the timing of it, but the fact was, and everybody agreed, that the hematoma was what caused the baby's neurological injury. So we're showing this is what you see, this is what happens. They're talking about strips and what's on a little piece of paper that you can't see. We had a difference of opinion as to the interpretation of those strips. But a jury can't see, the doctors couldn't see what's going on inside there. So we wanted to give the jury a visual representation of what a hematoma looks like when it forms. We didn't think it would be proper to show an hour and a half long or two hour long video of this, the jury would go into a coma waiting for the bleed to actually occur. We showed how the process works, just as when somebody shows an anatomical drawing, they don't show it in life size or in life colors. They color code things and they blow it up so that the jury can actually understand what they're seeing. But why did, why were Zoe's fetal monitor strips superimposed on A2B and the pathology report of Zoe superimposed on A3? Well, A2B was just perfectly consistent with what, again, even Dr. Blake said. You're showing how the contractions can relate to the compression of the cord. Well, by using her particular strips, wasn't this designed to precondition the minds of the jurors to know that this is exactly what happened to Zoe? As opposed to giving them general information about what a variable deceleration was and on A3 how a hematoma formed. I think it was trying to show how compressions were occurring generally and then relate to this case, but that's not an issue that's in controversy in this case. No one's saying that there weren't cord compressions going on that were causing changes. Again, Dr. Blake, their expert, says by 9 o'clock there were changes that were unrelated to the hematoma, cord compression, that mandated that the baby come out. Nothing to do with the hematoma. Well, he didn't know that they were related or unrelated to the hematoma, did he? There's no way anybody knew what the reasons were for the variable decelerations, right? Well, the doctors in real time didn't know what Dr. Blake says. Right, right. If you look at the timing with Dr. Blake's opinions, what was going on at 9 o'clock when he says the cesarean section needed to occur could not have been the hematoma because the bleeding hadn't begun yet. Nobody moves the timing of the hematoma back to 9 o'clock. So something else was going on that something else was cord compression. That's not controversial. It's not controversial what was happening. The controversy, the difference of opinion was how should we have reacted to it. Did we react properly in interpreting what was going on or did we not? That's what the jury decided, and they decided that we had. When there is cord compression going on, what is the impact of the epidural then on this whole process? Does that in any way speed up the ultimate hematoma because there's compression, plus now we have additional movement of this child? Epidural pain injection? I don't think it had anything to do with anything, Your Honor. I don't think anybody ever argued that. The child, okay. Well, there was an exhibit in animation, A4, I believe that was, that showed what happened when the epidural was administered. Sometimes that can slow the baby's heart rate a little bit, but it doesn't affect cord compression. It doesn't affect what was happening. Well, the child moved, which could have changed the placement of the compression or the location of the compression. Which happens frequently whenever the mother switches from side to side, which is usually the technique that the nurses will use when addressing cord compression, turn to the left, turn to the right. Depending upon where the cord is and where it may be getting compressed, you move the baby around to try to relieve that pressure, and if at some point the baby doesn't respond appropriately, then you start looking at other issues. And in this case, the baby's, I don't think it's really that much controversy that the strips got better after that 9 o'clock timeframe that Dr. Blake was talking about. And around 10 o'clock, Dr. Chen was back in there with the patient, and the baby was doing fine. Dr. Blake doesn't say what he saw at that time required him again to do the cesarean section. It was just sort of a continuation. At 9 o'clock, I think it should have happened, so forever thereafter it should have happened. How many times did the jury see A3? I don't know off the top of my head. It was certainly several times, but as to the question of how many times the preamble was given, it was given every time. Counsel objected and argued in the brief that, well, there were times that the preamble wasn't given exactly the way we thought it should have been given. Yet there were no objections to that that would have allowed Judge Popejoy, who clearly carefully crafted a remedy here, to say, you know what, restate that counsel, or you need to do this in a different way. They didn't give Judge Popejoy the opportunity to determine whether or not there was a concern about how the preamble was being given, but it was given every time. And, in fact, counsel extensively cross-examined every one of the defense experts about the issue of timing, made the point over and over and over again, including in closing argument. It's almost an insult to the intelligence of the jury to suggest that, oh, gosh, they looked at that and said 11 seconds. They would have had to have ignored the evidence. There was no special interrogatory given here. So the only conclusion we can fairly reach is the jury looked at their interpretation of the strips and our interpretation of the strips, and they said, you know what, we think you did the right thing. And the timing of the hematoma had nothing to do with it. Okay. All right. Thank you, counsel. Thank you, Your Honor. Mr. Hedgeson. Thank you, Your Honor. If I may indulge, I think I have three points I'd like to address about what they said. If you have further questions, I'd certainly be happy to answer them, but that's all I plan on doing here. The first thing is you were just told by at least one of my opponents here that it was undisputed what happened here. Well, it was not undisputed. And one of the other problems with the video, the umbilical cord hematoma one, is that Dr. Sassoni, when he was on the stand testifying about it, said things along the lines of this is exactly what happened here. And Dr. Lodge said the same thing. And so there are ñ That was a little taken out of context, though, what Dr. Sassoni said. Wasn't he referring to, when you're talking about that, the Wharton's jelly and what happened there? Well, he said that he had made statements like that on more than one occasion. That could have been one of them. And I'll defer to Your Honor if you saw that in the record. But I believe he said something like that more than once, and at least one of those times is related to the jury seeing the thing blowing out in the context. And again, I'll defer to the record. I don't ñ my memory isn't that good on that. The second thing is that you've been repeatedly told that what was going on on the monitor strips two or three hours before when Dr. Blake was saying this delivery had to be done, there was no evidence that there was a hematoma then that had anything to do with that. First of all, there was evidence from both the pathology experts that this hematoma could have been started that far back. And secondly, Dr. Blake said, and this is in the report of proceedings of 2486 to 2489, that in his opinion there was evidence that the hematoma was contributing to what was seen on the monitor strips two to three hours before delivery, which fits with the pathology evidence in this case. So obviously we've talked about this. Not that they should have known it was the hematoma at that time, but on a causation basis, which was plainest theory, is this hematoma did not happen out of the blue all of a sudden at the end of the story. This had been happening earlier at a time when our experts said the baby should have been delivered. So the record is clear that the hematoma ñ there was evidence that the hematoma was contributing to what they were seeing on the monitor strips, whether they knew it was there or not, two to three hours before. So the videos were highly relevant to the issue of standard of care, whether the delivery should have been done, because it wraps into exactly what the theory was of the plant about when the delivery should have taken place. The last thing I want to say in response to my colleagues is that, you know, you asked some very good questions, Justice Zinoff, about the preamble, and we've talked about that a little bit with me earlier. And then the cross-examination, which I was duty-bound to do what I had to do with what I had to work with during that trial, and I appreciate the compliment that I did such a great job of that, apparently not good enough. But the Spreikler case, I think, is right on point on this, is there are some of these things, once you cross the line with these videos, the cautionary things, all those things, the ability to cross-examine cannot cure the prejudice from the jury seeing it. In this case, they saw it over and over and over again. So I'm supposed to be competing with what they've already seen and try to unring that bell? The preambles are going to unring that bell? The cross-examination with their experts is going to unring that bell? The case law is pretty clear on that, but this type of evidence that that is not going to cure that problem if you have crossed the line with something that violates the rule. And that's the third thing I wanted to address. So if Your Honors have any other questions or things for me, I'd be happy to answer. Do you want to rule in the motion? I will. Do you have any questions? No. Okay, the last thing I'd like to say, then, thank you, Your Honors, for your attention, is that you've seen the video, I'm sure, in light of my comments and my colleague's suggestion that we didn't argue that or it's not on the video, another look at it might be in order. But on the issue of abuse of discretion, this is kind of a unique case where it's not where you're reading a cold transcript and you're not there, you can't see things, you don't get a feel for it. This is the video. This is what we're here about. And this is an abuse of discretion standard. Quite clearly, we agree with that. But I think that's up for Your Honors to decide based on your understanding of that video, based on the context of this case, with all due respect to the trial judge, I think we just believe you got it wrong, and we are asking you to reverse and remand this for a new trial. Thank you. All right, we do have one housekeeping matter to deal with. There is a motion to file a supplemental authority, and there is an objection to that motion. At this point, we will grant that motion to over-objection, and there will be some reference as we finish the case. We will now take the matter under advisement. We will issue a decision in due course. We do appreciate the thoughtful and extensive argument this morning, and we are now going to stand in recess to prepare for our next hearing. Thank you.